UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20296-CR-MARTINEZ/BECERRA

UNITED STATES OF AMERICA

vs.

JOSHUA DAVID NICHOLAS,

      **Defendant.**

_____/

### EXHIBIT B TO PLEA AGREEMENT FOR DEFENDANT JOSHUA DAVID NICHOLAS

### STATEMENT OF FACTS IN SUPPORT OF PLEA AGREEMENT

Defendant **JOSHUA DAVID NICHOLAS** ("**NICHOLAS**") represents and admits that the following facts are true and that the United States could prove them at trial beyond a reasonable doubt:

### Relevant Entities

1.     EmpiresX, aka Empires Consulting Corp. ("EmpiresX"), was a company registered in Florida in or around October 2020. EmpiresX claimed that it was operational in five continents and more than fifty countries, to include physical offices in the United States, Vietnam, South Korea, Japan, and Brazil. EmpiresX maintained a registered address in Fort Myers, Florida, and had its main office in Miami, Florida, within the Southern District of Florida.

2.     EmpiresX operated a cryptocurrency investment platform and touted its various investment programs through social media. According to its marketing materials, prospective investors would invest cryptocurrency into EmpiresX and were later paid out returns in the form of cryptocurrency based on trading activity that EmpiresX was purportedly conducting.

3.      The United States Securities and Exchange Commission ("SEC") was an independent agency of the executive branch of the United States government. The SEC was responsible for enforcing federal securities laws and promulgating related rules and regulations.

4.      The United States Commodity Futures Trading Commission ("CFTC") was an independent agency of the executive branch of the United States government. The CFTC was responsible for regulating the United States derivatives market.

5.      The United States National Futures Association ("NFA") was the industrywide, self-regulatory organization for the United States derivatives industry, and had authority to take disciplinary actions against members that violated its rules.

6.      The Commodity Exchange Act ("CEA") required certain firms and individuals that conducted business in the derivatives industry to register with the CFTC. CFTC regulations also required, with few exceptions, CFTC-registered firms to be members of the NFA.

7.      Financial Institution 1 was a stock broker that offered an electronic trading platform for the trading of various financial assets.

8.      Foreign Cryptocurrency Exchange 1 was a foreign cryptocurrency exchange based in Singapore.

**Relevant Individuals**

9.      Defendant **EMERSON PIRES** ("**PIRES**") was a citizen of Brazil and resided in Lee County, Florida. **PIRES** was the Co-Founder and President of EmpiresX.

10.     Defendant **FLAVIO MENDES GONCALVES** ("**GONCALVES**") was a citizen of Brazil and Co-Founder of EmpiresX.

11.     Defendants **PIRES** and **GONCALVES** managed and controlled EmpiresX, and directed its international network of affiliates, promoters, and employees.

12. Defendants **PIRES** and **GONCALVES** disseminated marketing information to the general public via wire communications in the United States and globally regarding EmpiresX's various investment programs through their network of promoters and affiliates.

13. Defendant **JOSHUA DAVID NICHOLAS** ("**NICHOLAS**") was a United States citizen and resided in Martin County, Florida. **NICHOLAS** was the "Master Trader" for EmpiresX, and was described by **PIRES** and **GONCALVES** during investor meetings as the reason for the company's purported trading success.

14. Defendant **NICHOLAS** promoted and made misrepresentations regarding EmpiresX during online investor meetings to investors around the world.

15. Employee 1 was an individual who resided in Tampa, Florida, and was the Chief Financial Officer for EmpiresX. Part of Employee 1's role was to facilitate payments to investors.

16. Victim J.N.G. was a trader at a multinational investment bank and financial services company based in New York City. **NICHOLAS** misused Victim J.N.G.'s identity during an EmpiresX investor meeting.

## Relevant Terms

17. A "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others. Federal law required that an issuer of securities register offers and sales of those securities with the SEC when they offered and sold securities to the public, absent certain specified exemptions.

18. Cryptocurrency was a digital currency in which transactions were verified and records were maintained by a decentralized system using cryptography, rather than a centralized

authority such as a bank or government. Like traditional fiat currency, there were multiple types of cryptocurrencies, such as Bitcoin (BTC) and Ethereum (ETH).

19. The blockchain was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions. The blockchain recorded, among other things, the date and time of each cryptocurrency transaction, the unique cryptocurrency addresses associated with the transaction and the sending and receiving parties, and the amount of cryptocurrency transferred. The blockchain, however, did not identify the parties that controlled the cryptocurrency addresses involved in the transaction.

20. Cryptocurrency owners typically stored their cryptocurrency in digital "wallets," which were identified by unique electronic "addresses." By maintaining multiple cryptocurrency addresses and using foreign-based cryptocurrency exchanges, criminals engaged in cryptocurrency-based fraud could attempt to thwart law enforcement's efforts to track the flow of fraud proceeds and conceal the fraud by quickly transferring such proceeds in various amounts through multiple cryptocurrency addresses and across multiple blockchains.

21. A "cluster" referred to a collection of related cryptocurrency wallets or addresses usually under the control of a single entity or affiliated individuals.

22. Blockchain analytics referred to the application of investigative tools and techniques to the blockchain to trace and track cryptocurrency transactions.

23. A "trading bot" was a computer software programmed to trade a digital asset based on predetermined parameters.

## Conspiracy to Commit Securities Fraud

24. From in or around early 2021, and continuing through in or around the date of this Indictment, in Miami-Dade, Martin, and Lee Counties, within the Southern District of Florida, and

elsewhere, the defendant **JOSHUA DAVID NICHOLAS,** together with **EMERSON PIRES** and **FLAVIO MENDES GONCALVES,** as well as others, known and unknown, did knowingly and willfully combine, conspire, and agree to commit an offense against the United States, namely, securities fraud, that is, to knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes, and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in EmpiresX, in connection with the purchase and sale of investments in the EX BOT, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

Formation and Management of EmpiresX

25. In or around 2020, **PIRES** and **GONCALVES** created EmpiresX.

26. EmpiresX touted its various investment programs, to include its proprietary trading robot, the "EX BOT," through social media, online video investor calls, and in-person meetings. EmpiresX communicated with investors and prospective investors through online platforms and applications such as Zoom, YouTube, Telegram, and Facebook. EmpiresX conducted its business principally by means of websites accessible at www.expiresx.org and www.newera.empiresx.com (the "EmpiresX Websites"). The EmpiresX Websites were accessible worldwide to the public, including to individuals within the Southern District of Florida.

27. From the beginning, **PIRES** and **GONCALVES** aggressively marketed EmpiresX to prospective investors as a lucrative investment opportunity. **PIRES**, **GONCALVES**, and **NICHOLAS** falsely and fraudulently touted EmpiresX's purported investment platform involving trading bots and private investment as a simple, safe, and flexible choice to invest cryptocurrency and fiat currency.

28. **PIRES**, **GONCALVES**, and **NICHOLAS** conducted multiple online and in-person investor meetings, including with investors and potential investors in the Southern District of Florida, to promote EmpiresX's investment programs, to include the "EX BOT," as well as the purported returns that prospective investors could earn from investing with EmpiresX.

29. At these meetings, **PIRES** and **GONCALVES** also recruited promoters, known as "affiliates," to promote EmpiresX and its investment programs through a multi-level marketing scheme, or "pyramid scheme." As part of the recruitment effort, EmpiresX relied on its affiliates to solicit new investors, and enticed new investors with referral fees and participation in a "Career Plan," whereby they could earn additional prize incentives ranging from smart watches to luxury vehicles.

30. **PIRES** and **GONCALVES** aggressively touted and fraudulently marketed EmpiresX's purported proprietary trading bot, the "EX BOT," to prospective investors despite knowing that their representations contained multiple false and fraudulent statements.

31. Contrary to their representations regarding the EX BOT, EmpiresX did not employ a proprietary trading bot that could execute trades for investors and generate significant profits. Instead, EmpiresX operated a textbook Ponzi scheme by paying earlier investors with money obtained from later investors. **PIRES** and **GONCALVES** exercised primary control over the distribution of investors' funds.

32. **PIRES**, **GONCALVES**, and **NICHOLAS** offered and sold the EX BOT as a series of transactions or schemes because they promoted the EX BOT as an investment of money into a common enterprise with other investors, with the reasonable expectation of profits from the efforts of EmpiresX. The EX BOT therefore qualified as a "security" under the rules and regulations

governing the offer and sale of securities in the United States and required registration with the SEC.

33. Despite representations to the contrary, the defendants never registered, nor took steps to register, EmpiresX's investment program involving the EX BOT as an offering and sale of securities with the SEC, nor did they have a valid exemption from this registration requirement.

34. To persuade investors that their EX BOT was real and to invest in EmpiresX, **PIRES**, **GONCALVES**, and **NICHOLAS** held regular investor calls using a video conferencing application, which was accessible to prospective investors in the Southern District of Florida and elsewhere, and made numerous false and fraudulent misrepresentations regarding the EX BOT.

35. The defendants fraudulently represented that EmpiresX would take the investors' cryptocurrency investment, convert the cryptocurrency to fiat currency, and thereafter pool the investors' funds and execute trading in the U.S. stock market using the EX BOT.

36. The defendants also fraudulently represented that the EX BOT utilized multiple inputs (e.g., human input from defendant **NICHOLAS**, the "Master Trader," and 20 years of historical trading data) to employ advanced strategies for maximum performance and daily, reliable returns of up to 1% per day, which was converted back to and paid out in cryptocurrency.

37. Indeed, to further entice investors to invest, EmpiresX touted **NICHOLAS** as a "genius" trader and offered investors a separate investment option of having **NICHOLAS** manually trade their cryptocurrency investment in the U.S. financial markets.

38. As part of these marketing efforts, during an investor call on or about July 2, 2021, **NICHOLAS** fabricated his personal and professional background, including by misrepresenting himself as Victim J.N.G. (who had no affiliation with EmpiresX and was then a trader at a multinational investment bank and financial services company based in New York City). In doing so, **NICHOLAS** concealed from investors and potential investors his prior ban by the NFA for eight years for investment-related misconduct.

39. **PIRES** and **GONCALVES** also performed fictitious demonstrations showing the EX BOT in action—executing trades in the stock market that were tied to an EmpiresX trading

account with Financial Institution 1, which was always shown during these demonstrations to contain millions of U.S. dollars. **PIRES** falsely represented that the trading account with Financial Institution 1 was one of many EmpiresX brokerage accounts, each holding approximately $20 to $50 million.

40. To share in the purported investment profits generated from the EX BOT, individuals were required to open an EmpiresX account and to purchase a license, either for $200 or $400, to use the bot software. Investors thereafter invested additional capital to be pooled and invested using the EX BOT, as well as deposited additional money into a "credits" account. Credits were described by **PIRES** as "gasoline" for the bot, which would not run unless the investor funded the credits account.

41. EmpiresX controlled and held investors' cryptocurrency wallets within its online investment platform, known as the "Back Office." Upon purchasing the bot, EmpiresX promised investors a daily return of up to 1% of the capital investment, to be distributed automatically to the investors' cryptocurrency wallets held on the Back Office.

42. To disguise and conceal investors' funds, and that EmpiresX was not independently generating meaningful revenue through the EX BOT, blockchain analytics revealed that **PIRES** and **GONCALVES** laundered investors' funds generated in the United States and elsewhere through EmpiresX's cluster of cryptocurrency wallets, Foreign Cryptocurrency Exchange 1, and elsewhere.

43. **PIRES** and **GONCALVES** maintained control over EmpiresX's cryptocurrency wallets and diverted investors' funds in order to cover personal expenditures, including exotic vehicles, clothing from high-end retailers, and attorneys' fees. **PIRES** and **GONCALVES** then paid **NICHOLAS** with investor funds.

Restrictions and Eventual Shutdown of Purported "EX BOT" Investment Returns

44. **PIRES** and **GONCALVES** also misled investors regarding investors' purported ability to withdraw their investments at a time of their choosing. Initially, investors were, in fact, able to withdraw their funds when they wanted. However, as the Ponzi scheme grew and faced

the prospect of collapsing, EmpiresX added restrictions to investor withdrawals.

45. For example, in or around October 2021, EmpiresX imposed restrictions to withdrawals that effectively disincentivized investors from withdrawing their money. **PIRES** and **GONCALVES** claimed they had to make the new changes to comply with SEC requirements. During an investor call on or about October 11, 2021, **PIRES** told investors they were allowed a maximum of three capital withdrawals, and that they could withdraw profits less frequently. Moreover, capital withdrawals were subject to large fees if withdrawn within the first three months after investing (e.g., a fee of 40% if withdrawn within the first 30 days).

46. In an effort to lull investors into believing that EmpiresX was still a sustainable investment opportunity, during an investor call on or about October 21, 2021, **GONCALVES** falsely represented that EmpiresX had paid out over $112 million to investors to date, to include $12 million over more than 7,000 payments the previous week. Employee 1, EmpiresX's CFO, spoke up to confirm the validity of these numbers.

47. By the fall of 2021, however, despite **GONCALVES'** claim that it was still paying out returns, EmpiresX began routinely preventing investors from withdrawing funds from their accounts.

48. In total, EmpiresX fraudulently obtained approximately $100 million from victim investors.

49. Since approximately November 2021, investors have been largely unable to withdraw their funds from EmpiresX and the Ponzi Scheme eventually collapsed when EmpiresX could no longer pay earlier investors with money obtained from newer investors. Investors lost approximately $40.6 million because of the EmpiresX Ponzi Scheme.

50. In furtherance of the conspiracy, and to accomplish its purpose, **NICHOLAS**, or one of his co-conspirators, committed and caused to be committed in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others, all in violation of Title 18, United States Code, Section 371:

   a. In or around 2020, defendants **PIRES**, **GONCALVES**, and **NICHOLAS** offered

and sold investment contracts to the public through EmpiresX's offering of the EX BOT, to include investors in Miami, Florida.

b. On or about June 3, 2021, defendants **PIRES**, **GONCALVES**, and **NICHOLAS** conducted a video conference call with investors and prospective investors regarding the EX-BOT, and **GONCALVES** displayed a fictitious demonstration of the EX BOT in action.

c. On or about July 2, 2021, **GONCALVES** and **NICHOLAS** conducted a video conference call with investors and prospective investors in which **GONCALVES** displayed a fictitious demonstration of the EX BOT in action. During this same call, **NICHOLAS** fabricated his personal and professional background.

d. On or about October 11, 2021, **PIRES** and **NICHOLAS** conducted a video conference call with investors and prospective investors in which **PIRES** stated that investors were permitted a maximum of three capital withdrawals. During that same call, **NICHOLAS** falsely claimed that the company had filed a "notice of exempt security offering" several weeks prior, and had re-filed certain paperwork with the SEC the previous week.

51. The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

Date: 9/8/22      By: _____
KEVIN LOWELL
SARA HALLMARK
TRIAL ATTORNEYS
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
YISEL VALDES
ASSISTANT UNITED STATES ATTORNEY

\*\*\*\*

I have read this STATEMENT OF FACTS IN SUPPORT OF DEFENDANT JOSHUA DAVID NICHOLAS'S PLEA AGREEMENT in its entirety. I have had enough time to review and consider this statement of facts, and I have carefully and thoroughly discussed every part of it with my attorney. I agree that this Statement of Facts is sufficient to support a plea of guilty to the charge described in the plea agreement and to establish the Sentencing Guidelines factors set forth in the plea agreement.

_____  9/8/22
JOSHUA DAVID NICHOLAS            DATE
Defendant

_____  9/8/22
JULIE HOLT                       DATE
Attorney for Defendant
JOSHUA DAVID NICHOLAS